IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **MELISSA A.,**[1] <br><br> **Plaintiff,** <br><br> v. <br><br> **COMMISSIONER OF SOCIAL SECURITY,** <br><br> **Defendant.** | Case No. 3:22-CV-00036-NJR |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

In accordance with 42 U.S.C. §405(g), Plaintiff seeks judicial review of the final agency decision denying her application for Supplemental Social Security Income (SSI) pursuant to 42 U.S.C. § 423.

### BACKGROUND

Plaintiff applied for SSI in September 2018, alleging an onset date of December 31, 2012. (Tr. 18). Plaintiff's claim was initially denied on January 25, 2019, and upon reconsideration on May 30, 2019. (Tr. 156, 168). On June 21, 2019, Plaintiff filed a request for a hearing by an Administrative Law Judge (ALJ). (Tr. 172). After holding an evidentiary hearing, an ALJ denied the application on May 13, 2021. (Tr. 29). The Appeals Council denied Plaintiff's request for review on November 9, 2021, making the ALJ's

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

decision the final agency decision subject to judicial review. (Tr. 1). Accordingly, Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

## ISSUE RAISED BY PLAINTIFF

Plaintiff raises the following issue:

The ALJ erred by not basing his decision regarding Plaintiff's Residual Functional Capacity upon substantial evidence.

(Doc. 17, p. 13).

## LEGAL STANDARD

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently employed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his or her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of

disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). While judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

**EVIDENTIARY RECORD**

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

## I.  Evidentiary Hearing

Plaintiff was unrepresented at the evidentiary hearing on May 4, 2021. (Tr. 38). Plaintiff was previously a Certified Nurses Aid in several nursing homes from 2004 to 2006, but testified she has not maintained employment since. (Tr. 41, 294-296). Plaintiff testified about her depression, difficulty concentrating, and anxiety. (Tr. 41-42). Plaintiff explained that her impairments keep her from focusing or remembering what she is doing and that her anxiety keeps her "all up in the air." (Tr. 42-43). To treat her impairments, Plaintiff states that she sees P.A. Martin, a psychiatrist, and takes medication for her anxiety. (Tr. 42). Plaintiff does some light cooking, but does not partake in other household or caregiving duties. (Tr. 43-44).

A vocational expert ("VE") also testified. The ALJ asked him a hypothetical question that corresponded to the RFC assessment—whether there would be medium or light work for an individual with the same age, education, and work experience as Plaintiff. (Tr. 46). The VE testified that there are approximately 82,100 medium and unskilled packager jobs nationally, approximately 226,000 light and unskilled housekeeping jobs nationally, and 111,000 light and unskilled assembler jobs nationally. (*Id.*). The ALJ also asked the VE about the impact on the ability of the individual to perform these jobs with additional restrictions such as tolerating no more than occasional

interactions with co-workers and supervisors and no more than incidental interaction with the general public. (Tr. 46). The VE testified that these restrictions would not impact or reduce the number of light-medium jobs available. Finally, the ALJ asked the VE about the impact on the ability of the individual to perform these jobs, but added the individual would be off-task approximately 15 percent of the workday on an ongoing basis. (Tr. 46-47). In response, the VE testified there would be no work. (Tr. 47).

## II.     Relevant Medical Records

In 2015, Plaintiff went to the Family Counseling Center ("FCC") as part of her court-mandated substance abuse evaluation.[2] (Tr. 438, 822). By late May 2016, Allison Henriksen, MS ED, QMHP ("Henriksen"), Sarah Newman, MSW, QMHP ("Newman"), and Julie Mason, MS QMHP LCPC ("Mason") from the FCC conducted an Adult Comprehensive Assessment. (Tr. 834). They noted that Plaintiff was "fairly dependent on others to complete her activities of daily living." (Tr. 829). They also reported that Plaintiff "tends to exaggerate her stressors and lacks [ ] [ ] [an] ability to solve problems and

---

[2] Plaintiff was charged with felony possession and manufacture of methamphetamine around 2014. (Tr. 105). Besides the felony, Plaintiff "committed the crime of perjury when she knowingly misled this Agency regarding her fugitive felon status." (Tr. 106). Indeed, a prior ALJ noted the following:

> In November 2012, the claimant submitted an application for SSI benefits in which she expressly denied having been accused of a felony. (Ex. B2D). However, her subsequent reporting shows that she was aware of her outstanding felony arrest warrant when she made this statement in her application for benefits. (See Ex. B16F/2, 9). The claimant's behavior in fleeing persecution and subsequently misleading this Agency regarding her fugitive status illustrates a pattern of intentional deceit that supports giving greater weight to objective findings when they conflict with her subjective reporting.

(*Id.*).

situations on her own." (Tr. 832).

In September 2017, Dena Taylor, N.P. ("Taylor") observed that Plaintiff's insight was poor and had "abnormal affect." (Tr. 597). That same month, P.A. Martin conducted a mental status exam on Plaintiff. (Tr. 599). The mental status exam showed Plaintiff was "oriented to situation, time, place, and person and alert and memory intact." (*Id*.). Plaintiff's affect was anxious and constricted and congruent to thought content. (*Id*.). Martin recorded that Plaintiff's insight and judgment were impaired. (*Id*.).

In early October 2017, Plaintiff reported to Taylor that she stopped taking her medication for seizures and migraine headaches. (Tr. 593-95). The mental status exam showed Plaintiff was cooperative, calm, "oriented to situation, time, place, and person and alert and memory intact." (Tr. 595). Taylor noted that Plaintiff's affect was sad, tearful, and flat and congruent to thought content. (*Id*.). Taylor recorded that Plaintiff's insight and judgment were impaired. (*Id*.). Taylor noted to consult PCP regarding "[Plaintiff's] use of controlled substance compliance." (*Id*.). By mid-October 2017, Taylor saw Plaintiff and noted that her insight was poor. (Tr. 592). Plaintiff also had an abnormal affect. (*Id*.). Taylor also observed that Plaintiff was oriented to time, place, and person. (*Id*.). Taylor noted that Plaintiff's recent and remote memory were normal. (*Id*.).

On October 19, 2017, Plaintiff saw P.A. Martin for medication management. (Tr. 588). The mental status exam showed Plaintiff was cooperative, calm, "oriented to situation, time, place, and person and alert and memory intact." (Tr. 590). Martin noted that Plaintiff's affect was pleasant and congruent to thought content, but her insight and judgment were impaired. (*Id*.). By late October 2017, Taylor conducted a psychiatric exam

on Plaintiff. (Tr. 587). During the exam, Plaintiff had good judgment. (*Id.*). Plaintiff was active and alert. (*Id.*) Taylor also observed that Plaintiff was oriented to time, place, and person. (*Id.*). Taylor noted that Plaintiff's recent and remote memory were normal. (*Id.*).

In November 2017, Plaintiff presented to P.A. Martin for medication management reporting that "[she] would like to not use the Prozac." (Tr. 583). P.A. Martin observed that Plaintiff was "oriented to situation, time, place, and person and alert and memory intact." (Tr. 585). However, Plaintiff's insight and judgment were impaired. (*Id.*). P.A. Martin noted that Plaintiff could not identify problematic side effects to the Prozac. While he prescribed a week's worth of Restoril, P.A. Martin noted "follow[ing] closely due to [Plaintiff's] non-compliance." (*Id.*). P.A. Martin further acknowledged that Plaintiff reported anxiety and depression, but presents with medication seeking behaviors. (*Id.*).

A month later, Plaintiff had a medication management appointment with P.A. Martin and reported that she stopped taking the Wellbutrin because she threw up. (Tr. 571). The mental status exam showed Plaintiff was cooperative, calm, "oriented to situation, time, place, and person and alert and memory intact." (Tr. 572). P.A. Martin noted that Plaintiff's affect was pleasant and congruent to thought content, but her insight and judgment were impaired. (*Id.*). P.A. Martin noted that Plaintiff wanted to change her Zoloft medication and stopped taking Seroquel. (Tr. 573). P.A. Martin stressed the importance of medication compliance. (*Id.*).

By January 2018, Plaintiff reported to P.A. Martin that she "stopped the Effexor because it made her eat more." (Tr. 566). Plaintiff's insight and judgment were impaired. (Tr. 567). P.A. Martin stressed the importance of medication compliance. (Tr. 568). On

January 25, 2018, Richard Parks, M.D. ("Dr. Parks") examined Plaintiff's mental status. (Tr. 841). Dr. Parks noted that Plaintiff "has poor fund of current event knowledge[.]" (*Id.*). Plaintiff reported that "she hears her ex-husband's voice yelling at her every night, threatening to kill her." (*Id.*). During this appointment, Dr. Parks provided Plaintiff with prescriptions for Celexa, Prazosin, Risperdal, and Klonopin. (*Id.*).

Less than a month later, Plaintiff had a follow-up with Dr. Parks, where she explained that she stopped taking Prazosin because it makes her tired and exhausted. (Tr. 842). By March, Plaintiff reported to Dr. Parks that "she stopped taking the Risperdal because she started putting on weight and it made her feel terrible." (Tr. 844).

In July 2018, Plaintiff was seen by P.A. Martin for medication management and evaluation. (Tr. 522). During her mental status exam, P.A. Martin noted that Plaintiff's insight, judgment, and thought processes were impaired or tangential. (Tr. 525). Plaintiff also reported "hearing her name called and voices during the day." (*Id.*). P.A. Martin stressed the importance of medical compliance due to "previous inconsistent reports as well as history of hospitalizations with apparent overuse of medicine." (*Id.*). P.A. Martin reported that he "will not recommend use of benzodiazepine." (*Id.*).

In August 2018, Plaintiff was seen by Adia Cobb, MD ("Dr. Cobb") with FCC. (Tr. 849). Dr. Cobb reported that Plaintiff had a 30-day supply of Klonopin and "should have had 30 pills left, but only had 15 at the time of the pill count." (*Id.*). As a result, the "[s]taff member called to cancel remaining refills of her medication until this matter could be sorted out." (*Id.*). Plaintiff "performed an in office UDS which was negative for all substances, despite her insistence that she takes Klonopin daily." (Tr. 851). Ultimately,

Dr. Cobb chose to "no longer prescribe controlled substances to the patient secondary to concerns of diversion/misuse/abuse." (Tr. 853).

Later in August 2018, Plaintiff had a follow up with P.A. Martin regarding her depressive disorder. (Tr. 516). Plaintiff reported that "she had not been taking the Zoloft but is still having mood swings." (*Id.*). P.A. Martin noted that Plaintiff again reported poor medication compliance. Plaintiff had not taken Zoloft as recommended, but was taking Klonopin prescribed by Dr. Hasty. (Tr. 518). P.A. Martin observed that Plaintiff "continues to have another prescriber for benzo—I do not recommend use of controlled substance due to poor compliance, and [Plaintiff] declined antidepressants." (Tr. 519).

A month later, Taylor observed that "[Plaintiff] has been on Percocet for abdominal pain but failed 2 drug screens." (Tr. 498). "So will no longer be getting any pain medication." (*Id.*). In October 2018, P.A. Martin saw Plaintiff for medication management and evaluation. (Tr. 618). Plaintiff stated she was no longer taking pain medications. (*Id.*). Later in October 2018, P.A. Martin saw Plaintiff. Plaintiff reported that she "stopped taking the medicine because [she] had nausea and throwing up." (Tr. 624). Martin reported the following:

> A lengthy discussion was had regarding use of non-controlled substances. [Plaintiff] does have a history of poor compliance. [Plaintiff] also has a history of AMS in past and due to multiple hospitalizations controlled medicine has not been prescribed by this provider for a period of time.

(Tr. 628).

In January 2019, Fred Klug Ph.D. ("Dr. Klug") conducted a mental status exam. Dr. Klug determined that Plaintiff was "[a]ttentional span was impaired, and

concentration was poor." (Tr. 650). According to Dr. Klug, Plaintiff's "[s]hort-term memory was poor with encoding deficits [and] [her] long-term memory was marginal, but she was an extremely poor historian." (*Id.*). In mid-January 2019, Plaintiff went to the Union County Hospital Emergency Department for pain and was prescribed Percocet. (Tr. 672-74). She went there again on February 14, 2019, stating she was out of pain medication. (Tr. 659). A urine drug screen showed Plaintiff was positive with opiates and benzodiazepines. (Tr. 660).

In April 2019, Plaintiff went to the Emergency Department at Massac Memorial Hospital. Plaintiff reported her history of cervical cancer and reported that she has been out of her medication for four months. (Tr. 732). At the visit, she was prescribed Percocet and Sennosides. (Tr. 737). She presented there again in July and was given Morphine. (Tr. 746). In August 2019, she reported that she has cancer in her ovary. (Tr. 749). She was provided with one tablet of Percocet. (Tr. 754). In October 2019, she went back to Massac Memorial Hospital reporting pain and again was provided a Percocet tablet. (Tr. 758-61).

In July 2019, a mental status exam performed by Erica Vining ("Vining") of Rural Health, Inc. noted that Plaintiff had "visual hallucinations" and suffered from delusions. (Tr. 780). Vining saw Plaintiff again in August 2019. (Tr. 773). Plaintiff stated during this follow-up that "she needed to get off the Lexapro because she thinks it makes her irritable." (*Id.*). During the mental status exam, Vining noted Plaintiff was having visual hallucinations and "delusions." (*Id.*).

In September 2019, Plaintiff began seeing Richard Buchman, M.D. ("Dr. Buchman"). She reported at this appointment that she hears her ex-husband's voice

yelling sometimes. (Tr. 910). Dr. Buchman diagnosed Plaintiff with schizophrenia. (Tr. 912). In late November 2019, Dr. Buchman reported that Plaintiff "appears significantly more at ease today, smiles frequently." (Tr. 928).

In January and February 2020, Plaintiff reported to P.A. Martin that she stopped taking Zyprexa and clonidine. (Tr. 1154, 1159). Plaintiff had a mental health assessment completed by Miranda Sullivan, BSW, MHP ("Sullivan") of FCC in March 2020. Plaintiff reported "not us[ing] Meth again until the age of 39 in 2019 for approximately 6 months after successfully completing parole." (Tr. 904). Plaintiff reported use almost daily until January 2020. (*Id.*). Plaintiff "report[ed] recurrent use resulting in failure to fulfill major role obligations at work/school/home . . . ." (*Id.*). "She also made the connection between her use and losing her employment." (*Id.*).

By March 2020, Plaintiff had stopped taking doxepin. (Tr. 1149). P.A. Martin reported no psychosis or mania, even though Plaintiff reported seeing shadows and hearing her name called. (*Id.*). A month later, Plaintiff went to P.A. Martin for a follow-up. (Tr. 1144). P.A. Martin again reported no psychosis or mania, even though Plaintiff reported seeing shadows and hearing her name called. (*Id.*).

In May 2020, Plaintiff was seen by P.A. Martin. (Tr. 1138). Plaintiff reported seeing her mother when she was not there. (*Id.*). Plaintiff was no longer taking Abilify because it was making her feel shaky. She also ceased taking medication for depression. (Tr. 1139). Plaintiff reported the same hallucinations to Dr. Buchman in May 2020. (Tr. 1208).

In August 2020, P.A. Martin further reported that "[Plaintiff] has not been taking medicines consistently, so he will discontinue." (Tr. 1136). P.A. Martin noted that

Plaintiff's thought processes were impaired, and her judgment was mildly impaired. (Tr. 1135). Plaintiff reported no hallucinations. (Tr. 1132).

In October and November 2020, Plaintiff had office visits Dr. Buchman. (Tr. 1197-98). Plaintiff was still "hearing some voices occasionally but not as frequently." (*Id.*). In December 2020, Plaintiff reported to P.A. Martin that she ceased taking Celexa. (Tr. 1126). P.A. Martin noted that Plaintiff's thought processes were impaired, and her judgment was mildly impaired. (Tr. 1129). Later that December, Plaintiff reported being stressed, "but does not identify specific panic s/s changing in severity and mostly identifies 'shaking real bad.'" (Tr. 1120). P.A. Martin then wrote "no psychosis or mania." (*Id.*). P.A. Martin then started Plaintiff on Cymbalta for depression and anxiety and Prazosin for sleep. (Tr. 1124).

In January 2021, Plaintiff reported to P.A. Martin that she ceased taking Cymbalta. (Tr. 1113). Later in January 2021, Plaintiff told Dr. Buchman that Seroquel really helped her mood, sleep, and auditory hallucinations. (Tr. 1193). Plaintiff noted she continues to hear voices. (*Id.*). By March 2021, Plaintiff had a follow-up appointment with P.A. Martin reporting improvement with depression. (Tr. 1100). Plaintiff reported "less feelings of low mood, pessimism, worry, anxiety feelings of being overwhelmed and less difficulty with focus and concentration." (*Id.*).

III. **State Agency Consultants' Opinions**

In January 2019, Howard Tin, Psy.D. ("Tin") assessed Plaintiff's RFC based on a review of the record. (Tr. 123-135). Tin indicated that Plaintiff had mild difficulties understanding, remembering, or applying information. (Tr. 129). Tin further indicated

that Plaintiff had mild difficulties interacting with others. (*Id*.). Ultimately, Tin found that "[Plaintiff's] allegation of the severity of the disorder is not consistent with claimant's ability to function generally well from day to day." (Tr. 131). In May 2019, M.W. DiFonso, Psy.D., the second state agency consultant, agreed with Tin's opinion. (Tr. 149-151).

## DECISION OF THE ALJ

The ALJ followed a five-step sequential evaluation process for determining whether Plaintiff is disabled. He determined if the claimant has not engaged in substantial gainful activity since the alleged onset date. (Tr. 20). The ALJ found that Plaintiff has the following severe impairments: post-traumatic stress disorder (PTSD), depression, anxiety, panic disorder, personality disorder, and schizophrenia. (*Id*.).

The ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments within the meaning of the Social Security Act. (Tr. 21). Therefore, the ALJ found that Plaintiff had the RFC "to perform a full range of work at all exertional levels but with the following non-exertional limitations: she can understand, remember, and carry out instructions for simple tasks on a sustained basis in a work setting requiring no more than occasional interaction with the general public." (Tr. 23). The ALJ found that Plaintiff had no past relevant work. (Tr. 28). Based on the testimony of the Vocational Expert ("VE"), the ALJ found that Plaintiff was not disabled because she was able to do other jobs that exist in significant numbers in the national economy. (Tr. 29).

**DISCUSSION**

I.  **Basis for RFC Determination**

Plaintiff argues that the "RFC determination is not based upon substantial evidence." (Doc 17, p. 15). Plaintiff contends that the RFC determined by the ALJ does not adequately reflect Plaintiff's very serious deficits in memory, concentration, and distractibility issues. (*Id*. at pp. 15-16). According to the Plaintiff, "[t]he ALJ's reasoning supporting his finding regarding Plaintiff's RFC is based on cherry-picking evidence supporting his findings while ignoring contradictory information." (*Id*. at p. 17). Plaintiff concludes "the ALJ's 'accurate and logical bridge' is unsound." (*Id*. at p. 18).

A.  *P.A. Martin's Opinion*

While Plaintiff's counsel is throwing a kitchen-sink collection of arguments at the Court, the Court will begin by analyzing Plaintiff's arguments as to the ALJ's alleged failure to explain why he discredited P.A. Martin. For claims filed on or after March 27, 2017,[3] the ALJ is required to evaluate the medical opinion evidence under 20 C.F.R. § 404.1520c. Under this regulation, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." *Id*. An ALJ is required to articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case record." *Id*. When evaluating medical opinions, 20 C.F.R. § 404.1520c lists out factors for ALJ's to consider

---

[3] Plaintiff filed her claim in 2018. (Tr. 18).

including: supportability, consistency, relationship with the claimant, specialization, and other factors that tend to support or contradict a medical opinion or prior administrative medical finding. *Id*. "An ALJ's decision must explain how she considered the factors of *supportability* and *consistency*, but she is not required to explain how she evaluated the other factors." *Josefina T. v. Kijakazi*, 2022 WL 2669523, at *3 (N.D. Ill. July 11, 2022) (citing 20 C.F.R. § 404.1520c(b)(2)) (emphasis added).

Plaintiff argues that "[t]he only reason given by the ALJ for not adopting the opinions of PA Martin is that his opinion is in a check-box form and he does not explain his reasons for giving the limitations on the form." (Doc. 17, p. 15). The Court disagrees. The ALJ explained why he discredited P.A. Martin's mental medical source statement in March 2020, noting the following:

> The undersigned does not find this opinion persuasive, as it is a check-box form, and PA-C Martin does not explain his reason for giving the limitations. The undersigned notes that the claimant stopped taking her medications for a period, cared for her elderly parents, and the record as a whole is more persuasive of the limitations contained in the above residual functional capacity.

(Doc. 13-2, p. 28). The ALJ continued, noting the following:

> The statement from her treating mental health provider Gabriel Martin PA-C is not persuasive (Ex. C12F). This is a check-a-box form without any explanation for degree of limitation indicated. The updated records from this source continue to indicate ongoing caregiving for elderly parents. Some medication changes and claimant stopping medications due to alleged side effects without first consulting with providers. These records contain some abnormal findings, but the findings do not change much and appear to just carry over from visit to visit. For example, in August of 2020, she reports no longer having akathisia symptoms after medication change C14F, p. 39, but the mental status examinations continue to note the same complaint/observations regarding akathisia during the exam sections. Additionally, it is noted that during the consultative examination there

> were some findings such as "poor" and "impaired", but no specific functional limitations were assessed or explanation given regarding these findings (Ex. C5F). These findings are not persuasive evidence of the claimant's ongoing ability to function and are not consistent with the degree of caregiving for her parents that is indicated in her treatment records.

(*Id*. at p. 29).

Next, Plaintiff notes that "even without the ALJ's improper reasoning related to the check-box form, the ALJ ignores the fact that PA Martin's extensive medical records are in the transcript of record and his records support his opinion." (Doc. 17, p. 16). This argument is merely asking the Court to reweigh the evidence, but again, this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester*, 920 F.3d at 510.

   B.  *Non-Compliance with Medication*

When an "individual fails to follow prescribed treatment that might improve symptoms, [the] [ALJ] may find that the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." SSR 16-3p, 2017 WL 5180304, at *9. On the surface, it appears the ALJ properly considered Plaintiff's non-compliance with psychotropic medication when assessing the intensity and persistence of her symptoms. The problem is the ALJ "ignores one of the most serious problems in the treatment of mental illness—the difficulty of keeping patients on their medications." *Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010). "The drugs used to treat *schizophrenia*, for example, can make a patient feel drowsy and stunned." *Id*. (emphasis added). In *Jelinek*, the Seventh Circuit explained:

> The ALJ apparently concluded that Jelinek's symptoms would have remained under control but for an unwillingness to take her medications as directed. But we have often observed that bipolar disorder, one of Jelinek's chief impairments, is by nature episodic and admits to regular fluctuations even under proper treatment. ALJs assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference.

*Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011).

While the ALJ found that Plaintiff had severe impairments including schizophrenia, he failed to consider how Plaintiff's mental health impacts her ability to take advantage of treatment and her medication. Because the ALJ failed to sufficiently engage with the evidence, this case must be remanded.

C. *Cherry-picking and Activities of Daily Living*

The ALJ also cherry-picked when he found that the medical evidence was replete with references to Plaintiff consistently providing care for her parents. Specifically, the ALJ notes the following:

> For example, in her function report and during the hearing she specifically denied doing any caregiving, but throughout her treatment records, she reports caregiving for her elderly parents.

(Tr. 28). Both the Commissioner and ALJ are correct. Plaintiff reports caring for her parents in her medical records from August 2018, October 2018, July 2019, August 2019, February 2020, March 2020, April 2020, May 2020, and January 2021. (Tr. 510, 518, 618, 780, 1060, 1085, 1090, 1106, 1144, 1138).

The problem is the ALJ cherry-picks from P.A. Martin's treatment records. The ALJ used numerous treatment records from P.A. Martin to find that Plaintiff

continuously reported caregiving for her parents. (Tr. 510, 518, 618, 1060, 1085, 1090, 1106, 1144, 1138). Yet, when P.A. Martin's records show abnormal findings, the ALJ characterizes them as "just carry[ing] over from visit to visit." (Tr. 28). This example of cherry-picking justifies a remand.

## Conclusion

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

DATED: March 27, 2023

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**